**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN 249203)
ak@kazlg.com
Mona Amini (SBN 296829)
mona@kazlg.com
Gor Antonyan (SBN 354718)
gor@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

*Attorneys for Plaintiff*
Kristine Darbinyan

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTINE DARBINYAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>LAFAYETTE FEDERAL CREDIT UNION,<br><br>     Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. **CALIFORNIA CONSUMER PRIVACY ACT OF 2018, CAL. CIV. CODE §§ 1798.100,** *et seq.***;**<br>2. **CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200,** *et. seq.***;**<br>3. **BREACH OF IMPLIED CONTRACT; and**<br>4. **NEGLIGENCE**<br><br>**JURY TRIAL DEMANDED** |

//

//

//

//

//

//

//

//

Plaintiff KRISTINE DARBINYAN ("Plaintiff"), individually and on behalf of the general public and all others similarly situated (the "Class members"), by and through her attorneys, upon personal knowledge as to facts pertaining to herself and on information and belief as to all other matters, brings this class action against Defendant LAFAYETTE FEDERAL CREDIT UNION ("Defendant" or "Lafayette") and alleges as follows:

## NATURE OF THE CASE

1.      This is a data breach class action arising out of Defendant's failure to implement and maintain reasonable security practices to protect consumers' sensitive personal information. For their business purposes, Defendant store and transmit personally identifiable information ("PII") from customers including, but not limited to, names, Social Security numbers, financial account numbers, loan account numbers (collectively "Personal Information").

2.      Beginning on September 16, 2024, an unauthorized third party accessed Defendant's system through employee's email account and acquired Plaintiff's and the Class members' personal information and PII, including their names, Social Security numbers, financial account numbers, loan account numbers (the "Data Breach").

3.      On or around March 20, 2025, Defendant reported the Data Breach to the Office of the Maine Attorney General, indicating that the Data Breach affected 75,545 persons.

4.      Defendant similarly reported the Data Breach to other states' Attorney General's offices, including Texas and California, and submitted a sample Notice of Data Breach.[1]

5.      Defendant's "Notice of Data Breach" letter obfuscated the nature of the Data Breach and the threat it posed by failing to inform Plaintiff and Class members great detail regarding how the Data Breach occurred. In addition, Defendant's breach

---

[1]https://oag.ca.gov/system/files/Adult%201%20YR%20CM%28102500597.1%29_Redacted%20%281%29.pdf

CLASS ACTION COMPLAINT

notification letter was sent to Plaintiff and Class members *over six months after* the Data Breach and failed to indicate when Defendant learned of the Data Breach or whether any information accessed and/or exfiltrated by the unauthorized person was recovered.

6. Defendant's failure to timely report and provide Plaintiff and the Class members with notice of the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

7. As a result of the Data Breach, and in light of their Personal Information now being in the hands of cybercriminals, Plaintiff and Class members were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. This substantial and imminent risk will remain for their respective lifetimes.

8. Armed with the Personal Information accessed in the Data Breach, the cybercriminals who carried out the Data Breach can and will commit a variety of crimes, including, *e.g.*, opening new financial accounts in Class members' names, taking out loans in Class members' names using their PII, using Class members' names to obtain medical services, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, obtaining driver's licenses in Class members' names, and giving false information to police during an arrest or criminal investigation.

9. There has been no assurance offered by the Defendant that all personal data or copies of data have been recovered or destroyed, or that it has adequately enhanced its data security practices sufficiently to avoid a similar breach of its network in the future.

10. Therefore, Plaintiff and Class members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Personal

CLASS ACTION COMPLAINT

Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.     Defendant owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard the Personal Information they collected from consumers, including Plaintiff and Class members, for business purposes and stored on their systems or networks. This included ensuring information would not be shared with unauthorized parties and that all third-party providers had security procedures in place to maintain the security and integrity of any data to which Defendant gave them access and sufficiently prevented unauthorized access to Defendant's systems.

12.     Defendant breached that duty by, *inter alia*, failing to implement and maintain reasonable security procedures and practices to protect Personal Information from unauthorized access and storing and retaining Plaintiff's and Class members' Personal Information on inadequately protected systems.

13.     The potential for improper disclosure and theft of Plaintiff's and Class members' Personal Information was a known risk to the Defendant, and thus Defendant was on notice that failing to take necessary steps to secure the Personal Information left it vulnerable to an attack.

14.     The Data Breach happened because of Defendant's inadequate cybersecurity, which caused Plaintiff's and Class members' Personal Information to be accessed, exfiltrated, and disclosed to unauthorized third parties in the Data Breach. This action seeks to address and remedy these failings.

15.     Defendant failed to properly monitor and implement adequate data security practices with regard to its computer network and systems that housed Plaintiff's and Class members' Personal Information. Had Defendant properly monitored its networks and implemented adequate data security practices, it could have prevented the Data Breach or, at the very least, discovered the Data Breach sooner.

CLASS ACTION COMPLAINT

16.     Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Personal Information of Plaintiff and Class members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Plaintiff and Class members' Personal Information, including PII, was compromised through disclosure to an unknown and unauthorized criminal third party.

17.     Plaintiff's and Class members' identities are now at risk because of Defendant's negligent conduct, which led to the Personal Information that it collected and maintained falling into the hands of data thieves and other unauthorized third parties.

18.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Personal Information was accessed and exfiltrated during the Data Breach.

19.     As set forth in the Prayer for Relief, among other things, Plaintiff seeks, for herself and the Class members, injunctive relief, including public injunctive relief, and actual damages.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

21.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in California and has sufficient minimum contacts with California.

CLASS ACTION COMPLAINT

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District.

## PARTIES

23.     Plaintiff Kristine Darbinyan is a resident of Los Angeles County, California.

24.     Defendant Lafayette Federal Credit Union is a Maryland-based credit union that conducts substantial business in California, including, but not limited to, offering its banking and related financial services to consumers within the state.

25.     The agents, servants and/or employees of the Defendant and each of them acting on behalf of the Defendant acted within the course and scope of his, her or its authority as the agent, servant and/or employee of the Defendant, and personally participated in the conduct alleged herein on behalf of the Defendant with respect to the conduct alleged herein.

## FACTUAL ALLEGATIONS

### PII Is a Valuable Property Right that Must Be Protected

26.     The California Constitution guarantees every Californian a right to privacy. And PII is a recognized valuable property right.[2] California has repeatedly recognized this property right, most recently with the passage of the California Consumer Privacy Act of 2018.

27.     In a Federal Trade Commission ("FTC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored the property value attributed to PII by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.

---

[2]     See John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

CLASS ACTION COMPLAINT

> The larger the data set, the greater potential for analysis – and profit.[3]

28.    The value of PII as a commodity is measurable. "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[4] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years.

29.    Companies recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[5]

30.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals openly post credit card numbers, Social Security numbers, PII and other sensitive information directly on various illicit Internet websites making the information publicly available for other criminals to take and use. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

31.    Recognizing the high value that consumers place on their PII, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of

---

[3]    FTC, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.

[4]    *See* Soma, *Corporate Privacy Trend, supra*.

[5]    Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

CLASS ACTION COMPLAINT

their PII.[6] This business has created a new market for the sale and purchase of this valuable data.[7]

32.    Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[8]

33.    One study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII between $11.33 and $16.58 per website.[9]

34.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII Has Grave and Lasting Consequences for Victims

35.    A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so. As more consumers rely on the internet and apps on their phone and other devices to conduct every-day transactions, data breaches are becoming increasingly more harmful.

36.    Theft or breach of PII is serious. The California Attorney General recognizes that "[f]oundational" to every Californian's constitutional right to privacy is "information security: if companies collect consumers' personal data, they have a

---

[6]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/ 18unboxed.html.

[7]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576 160764037920274.

[8]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1# page_scan_tab_contents.

[9]    II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* https://ideas.repec.org/p/wpa/wuwpio/0304001.html (emphasis added).

CLASS ACTION COMPLAINT

duty to secure it. An organization cannot protect people's privacy without being able to secure their data from unauthorized access."[10]

37.     The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use PII to take over existing financial accounts, open new financial accounts, receive government benefits and incur charges and credit in a person's name.[11] As the GAO Report states, this type of identity theft is so harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

38.     In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[12]

39.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[13] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks;

---

[10]     California Data Breach Report, Kamala D. Harris, Attorney General, California Department of Justice, February 2016.
[11]     *See* GAO, GAO Report 9 (2007) *available at* http:///www.gao.gov/new.items/d07737.pdf.
[12]     *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.
[13]     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

CLASS ACTION COMPLAINT

use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[14]

40.    According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[15] Other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft – a common result of data breaches – was $298 dollars.[16] And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[17]

41.    A person whose PII has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

42.    For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[18]

43.    It is within this context that Plaintiff and thousands of other individuals subjected to the Data Breach must now live with the knowledge that their PII was

---

[14]    *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[15]    Brook, *What's the Cost of a Data Breach in 2019*, *supra*.
[16]    Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.
[17]    Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).
[18] *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

- 10 -

CLASS ACTION COMPLAINT

KAZEROUNI LAW GROUP, APC

disclosed to unauthorized persons, is likely forever in cyberspace and likely available for sale on the dark web or black market.

### Defendant's Business and Collection of PII

44.    Defendant is a credit union that offers a range of financial products and services to its members, including but not limited to checking and savings accounts, credit cards, loans, and online banking.

45.    When consumers apply for or receive services with or through Defendant, they are required to, and ultimately provide, Defendant with certain personal information. The personal information required to make an account includes the consumer's name, contact information, social security number, and other personal information.

46.    Defendant acknowledges that it collects, stores, and transmits a substantial amount of personal information from consumers, including when they apply for a loan, give Defendant income information, open an account with Defendant, use a credit card, or pay their bills. The type of information is detailed in Defendant's Privacy Policy (last accessed March 2025),[19] states Defendant collects, at minimum, the following categories of personal information, or PII, from consumers:

- Social Security Number and income
- Accounts balances and payment history
- Creditworthiness and credit history

47.    Defendant collects personal information from California customers when they:

- Open an account or deposit money
- Pay their bills or apply for a loan
- Use their credit or debit card
- Browse Defendant's website

---

[19] *See* Defendant's Privacy Policy: https://www.lfcu.org/privacy-policy/

CLASS ACTION COMPLAINT

Defendant also collects personal information from others, such as credit bureaus, affiliates, or other companies.

### Defendant's Promises to Safeguard Customer PII

48.     Defendant represents and claims that: "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your non-public personal information."[20]

### The Data Breach

49.     On March 20, 2025, Defendant reported the Data Breach to the California Attorney General, among other states' agencies.

50.     Also, on March 20, 2025, Defendant sent Plaintiff and its other consumers a letter with the subject line, "Notice of Data Breach." According to Defendant, the Data Breach involved Plaintiff's and the Class members' names, Social Security numbers, financial account numbers, loan account numbers, and other sensitive personal information.

51.     Defendant offered a limited number of steps on how to protect against identity theft and fraud. These steps included reviewing account statements and credit reports, placing a fraud alert and requesting a "security freeze" on their credit files for fraudulent or irregular activity on a regular basis.

### Defendant Knew or Should Have Known PII Are High Risk Targets

52.     Defendant knew or should have known that PII like that at issue here, are high risk targets for identity thieves.

53.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

54.     The Identity Theft Resource Center reported that the business sector had

---

[20] Id.

CLASS ACTION COMPLAINT

the largest number of breaches in 2018. According to the ITRC this sector suffered 571 data breaches exposing at least 415,233,143 million records in 2018.[21] Further, the ITRC identified "hacking" as the most common form of data breach in 2018, accounting for 39% of data breaches. In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[22]

55.     Prior to the reach there were many reports of high-profile data breaches that should have put a company like Defendant on high alert and forced it to closely examine its own security procedures, as well as those of third parties with which it did business and gave access to its subscriber PII. Notable breaches included Capital One, which announced that in March 2019 a hacker had gained access to 100 million U.S. customer accounts and credit card applications. Similarly, in December 2018, Marriott International announced a data breach that affected up to 500 million individuals. The data breach allowed hackers to access customer names, physical addresses, phone numbers, email addresses, passport numbers, dates of birth, gender, loyalty program account information, and payment card information.[23]

56.     As such, Defendant was aware that PII is at high risk of theft, and consequently should have but did not take appropriate and standard measures to protect Plaintiff's and Class members' PII against data breaches and unauthorized disclosures that Defendant should have anticipated and guarded against.

### Plaintiff Kristine Darbinyan's Experience

57.     Sometime prior to September 16, 2024, Defendant received or obtained Plaintiff's Personal Information and/or Plaintiff provided her Personal Information to

---

[21]     Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, *available at* https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.
[22]     Data breaches break record in 2021, CNET (Jan. 24, 2022), https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/
[23]     *See* https://www.consumer.ftc.gov/blog/2018/12/marriott-data-breach#:~:text=Marriott%20International%20says%20that%20a,up%20to%20500%20million%20people.&text=The%20hotel%20chain%20says%20the,10%2C%202018%20could%20be%20affected

CLASS ACTION COMPLAINT

Defendant with the expectation that this information would be kept secure and not disclosed to unauthorized parties.

58.    As a condition of doing business with Defendant, Plaintiff was required to supply Defendant with her Personal Information, including her full name and Social Security number.

59.    Plaintiff would not have provided her Personal Information to Defendant had Plaintiff known that it would be kept using inadequate data security.

60.    On or around March 20, 2025, Plaintiff received Defendant's "Notice of Data Breach" letter, which informed Plaintiff that her Personal Information, including her name, Social Security number, financial account number, and loan account number, was accessed and acquired by an unauthorized third party in the Data Breach.

61.    After receiving the "Notice of Data Breach" letter, Plaintiff spent considerable time and effort taking actions to attempt to mitigate the impact of the Data Breach, including researching the Data Breach, monitoring accounts for any indications of actual or attempted identity theft or fraud and contacting credit bureaus to freeze her credit. This is time Plaintiff otherwise would have spent performing other activities or leisurely events for the enjoyment of life and this loss of time was a direct result of the Data Breach.

62.    As a result of the Data Breach, Plaintiff has suffered invasion of privacy, fear, anxiety, and stress as a result of the unauthorized release of her Personal Information, which Defendant had a duty to protect from unauthorized disclosure, including concern and uneasiness about unauthorized parties and cybercriminals viewing and potentially using her Personal Information for nefarious purposes, as well as unease about Defendant having additional data breaches or other unauthorized disclosures of her Personal Information in the future so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class members' Personal Information.

63.    As a result of Defendant's failure to implement and maintain reasonable

CLASS ACTION COMPLAINT

security procedures and practices appropriate to the nature of the personal information it collected and maintained, Plaintiff's Personal Information was accessed, exfiltrated, and otherwise disclosed in the Data Breach.

### *PII Is a Valuable Property Right that Must Be Protected*

64. The California Constitution guarantees every Californian a right to privacy. And PII is a recognized valuable property right.[24] California has repeatedly recognized this property right, most recently with the passage of the California Consumer Privacy Act of 2018.

65. In a Federal Trade Commission ("FTC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored the property value attributed to PII by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[25]

66. The value of PII as a commodity is measurable. "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[26] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years.

67. Companies recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[27]

---

[24]    *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[25]    FTC, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.

[26]    *See* Soma, *Corporate Privacy Trend, supra*.

[27]    Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

CLASS ACTION COMPLAINT

68.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals openly post credit card numbers, Social Security numbers, PII and other sensitive information directly on various illicit Internet websites making the information publicly available for other criminals to take and use. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

69.    Recognizing the high value that consumers place on their PII, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of their PII.[28] This business has created a new market for the sale and purchase of this valuable data.[29]

70.    Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[30]

71.    One study on website privacy determined that U.S. consumers valued the

---

[28]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/ 18unboxed.html.
[29]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576 160764037920274.
[30]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1# page_scan_tab_contents.

CLASS ACTION COMPLAINT

1  restriction of improper access to their PII between $11.33 and $16.58 per website.[31]

2  72.    Given these facts, any company that transacts business with a consumer

3  and then compromises the privacy of consumers' PII has thus deprived that consumer

4  of the full monetary value of the consumer's transaction with the company.

5  ### *Theft of PII Has Grave and Lasting Consequences for Victims*

6  73.    A data breach is an incident in which sensitive, protected, or confidential

7  data has potentially been viewed, stolen, or used by an individual unauthorized to do

8  so. As more consumers rely on the internet and apps on their phone and other devices

9  to conduct every-day transactions, data breaches are becoming increasingly more

10  harmful.

11  74.    Theft or breach of PII is serious. The California Attorney General

12  recognizes that "[f]oundational" to every Californian's constitutional right to privacy

13  is "information security: if companies collect consumers' personal data, they have a

14  duty to secure it. An organization cannot protect people's privacy without being able

15  to secure their data from unauthorized access."[32]

16  75.    The United States Government Accountability Office noted in a June 2007

17  report on Data Breaches ("GAO Report") that identity thieves use PII to take over

18  existing financial accounts, open new financial accounts, receive government benefits

19  and incur charges and credit in a person's name.[33] As the GAO Report states, this type

20  of identity theft is so harmful because it may take time for the victim to become aware

21  of the theft and can adversely impact the victim's credit rating.

22  76.    In addition, the GAO Report states that victims of identity theft will face

23  "substantial costs and inconveniences repairing damage to their credit records … [and

24  their] good name." According to the FTC, identity theft victims must spend countless

---

26  [31]    II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation*

27  (Mar. 2003) at table 3, *available at* https://ideas.repec.org/p/wpa/wuwpio/0304001.html (emphasis added).

28  [32]    California Data Breach Report, Kamala D. Harris, Attorney General, California Department of Justice, February 2016.

[33]    *See* GAO, GAO Report 9 (2007) *available at* http:///www.gao.gov/new.items/d07737.pdf.

hours and large amounts of money repairing the impact to their good name and credit record.[34]

77.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[35] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[36]

78.    According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[37] Other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft – a common result of data breaches – was $298 dollars.[38] And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[39]

---

[34]    *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.

[35]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

[36]    *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[37]    Brook, *What's the Cost of a Data Breach in 2019*, *supra*.

[38]    Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

[39]    Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

CLASS ACTION COMPLAINT

79.    A person whose PII has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

80.    For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[40]

81.    It is within this context that Plaintiff and thousands of other individuals subjected to the Data Breach must now live with the knowledge that their Personal Information, including PII, was disclosed and exfiltrated by unauthorized persons, is likely forever in cyberspace, and likely available for sale on the dark web or black market.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

82.    Plaintiff and Class members have suffered injury from the misuse of their PII that can be directly traced to Defendant.

83.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and Class members have suffered or are at an increased risk of suffering:

    a.  The loss of the opportunity to control how their PII is used;

    b.  The diminution in value of their PII;

    c.  The compromise and continuing publication of their PII;

    d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

---

[40]    *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

CLASS ACTION COMPLAINT

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen PII; and

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

84. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

85. The value of Plaintiff' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

86. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

87. It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

88. One such example of criminals using PII for profit is the development of "Fullz" packages.

89. Cyber-criminals can cross-reference two sources of PII to marry

unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

90.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

91.    Defendant disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII. Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff' and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Defendant Failed to Adhere to FTC Guidelines*

92.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses,

such as Defendant, should employ to protect against the unlawful exposure of PII.

93.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

 a.  protect the personal customer information that they keep;

 b.  properly dispose of personal information that is no longer needed;

 c.  encrypt information stored on computer networks;

 d.  understand its network's vulnerabilities; and

 e.  implement policies to correct security problems.

94.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

95.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

96.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer, data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

97.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' and employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

*Defendant Failed to Follow Industry Standards*

98.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

99.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

100.    Upon information and belief, Frontier failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

101.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

//
//
//
//
//

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

102. Plaintiff brings this class action on behalf of herself individually and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

103. Plaintiff seeks to represent the Nationwide Class defined as:

> *All individuals who were sent a Notice of Data Breach letter by Defendant notifying them that their Personal information was compromised in the Data Breach.*

104. Plaintiff also seeks to represent a California Subclass defined as:

> *All California residents who were sent a Notice of Data Breach letter by Defendant notifying them that their Personal information was compromised in the Data Breach.*

105. The Nationwide Class and the California Subclass are collectively referred to herein as the "Class."

106. Excluded from the Class are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

107. Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

108. The Class members are so numerous and geographically dispersed throughout California that joinder of all Class members would be impracticable. While the exact number of Class members is unknown, Defendant acknowledges the Data Breach, and Defendant's reporting of the Data Breach to the California Attorney General concedes the Data Breach involved the unencrypted PII of over 500 California residents. Plaintiff therefore believes that the Class is so numerous that joinder of all members is impractical.

109.  Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

110.  There is a well-defined community of interest in the common questions of law and fact affecting Class members. The questions of law and fact common to Class members predominate over questions affecting only individual Class members, and include without limitation:

    (a)  Whether Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected from Plaintiff and Class members;

    (b)  Whether Defendant breached its duty to protect the PII of Plaintiff and Class members; and

    (c)  Whether Plaintiff and Class members are entitled to damages and other equitable relief.

111.  Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to or that conflicts with the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

112.  A class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impractical. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for the individual members of the Class to redress the wrongs done to them, especially given that the damages or injuries suffered by each individual member of the Class are outweighed by the costs of suit. Even if the Class

CLASS ACTION COMPLAINT

members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments. By contrast, a class action presents fewer management difficulties and provides the benefits of single adjudication and comprehensive supervision by a single court.

113.   Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive, including public injunctive relief, and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the California Consumer Privacy Act of 2018 ("CCPA")
### Cal. Civ. Code §§ 1798.100, *et seq.*

#### *(On behalf of Plaintiff and the California Subclass)*

114.   Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

115.   As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[41]

116.   As a result, in 2018, the California Legislature passed the CCPA, giving

---

[41]   California Consumer Privacy Act (CCPA) Compliance, https://buyergenomics.com/ccpa-complience/.

CLASS ACTION COMPLAINT

consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendant failed to implement such procedures which resulted in the Data Breach.

117. It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." 1798.81.5(c).

118. Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

119. Plaintiff and Class members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

120. Defendant is a "business" as defined by Civ. Code § 1798.140(c) because Defendant:

      a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

CLASS ACTION COMPLAINT

b.      "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

c.      does business in California; and

d.      has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

121.   The PII taken in the Data Breach is "personal information" as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiff's and Class members' unencrypted names, social security numbers, financial account numbers, loan account numbers, and other personal information.

122.   Plaintiff's PII was subject to unauthorized access, exfiltration, or disclosure because their PII, including name, Social Security number, financial account number, loan account number, and other personal information was wrongfully disclosed and accessed by unauthorized third parties.

123.   The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff's and Class members' PII, including to ensure that its had sufficient security protocols in place to protect the PII to which Defendant maintained and/or gave third parties access to. Defendant failed to implement reasonable security procedures to prevent unauthorized access and disclosure of Plaintiff's and Class members' PII as a result of this Data Breach.

124.   On or around March 27, 2025, Plaintiff sent Defendant written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b). In the event Defendant does not, or is unable to, cure the violation within 30 days, Plaintiff will amend her complaint to pursue statutory damages as permitted by Civil Code

§ 1798.150(a)(1)(A).

125.   As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks actual damages, injunctive relief, including public injunctive relief, and declaratory relief, and any other relief as deemed appropriate by the Court.

**SECOND CAUSE OF ACTION**
**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

***(On behalf of Plaintiff and the California Subclass)***

126.   Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

127.   The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

128.   In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, California Consumer Privacy Act of 2018 (Cal. Civ. Code §§ 1798.100, *et seq.*) and Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and Civil Code § 1798.81.5. Plaintiff and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

129. Defendant also violated the UCL's unlawful prong by breaching contractual obligations created by its Privacy Policies and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of its posted privacy policy. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policies.

130. Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution, and the FTC Act (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

131. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policy and statutory and common law in that a portion of the money Plaintiff and Class members paid, or that Defendant received, for Defendant's products and services went to fulfill the contractual obligations set forth in its Privacy Policy, including maintaining the security of their PII, and Defendant's legal obligations, and Defendant failed to fulfill those obligations.

132. The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described claims, nondisclosures and misleading statements were

false, misleading and likely to deceive the consuming public in violation of the UCL.

133.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property as a result of Defendant's unfair and deceptive conduct. Such injury includes paying for a certain level of security for their PII but receiving a lower level, paying more for Defendant's products and services than they otherwise would have had they known Defendant was not providing the reasonable security represented in its Privacy Policy and as in conformance with its legal obligations. Had Plaintiff and Class members known about Defendant's substandard data security practices they would not have purchased Defendant's products or services or would have paid less for them. Defendant's security practices have economic value in that reasonable security practices reduce the risk of theft of customer's Personal Information.

134.    Plaintiff and Class members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing heightened increased risk of identity theft and identity fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) statutory damages under the CCPA, (v) deprivation of the value of their PII for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

135.    Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of herself, Class members, and the general public, also seeks restitution and an injunction, including public injunctive relief prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its

corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## THIRD CAUSE OF ACTION
### Breach of Implied Contract

136. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

137. Plaintiff and Class members provided their Personal Information including PII, to Defendant, either directly or indirectly, in the ordinary course of Defendant's business as a requirement to receive Defendant's services.

138. Plaintiff and Class members were required to provide their Personal Information as part of Defendant's regular business practices; and in order to receive Defendant's services, Plaintiff and Class Members provided their Personal Information, including PII, to Defendant.

139. Plaintiff and Class members entrusted Defendant, directly or indirectly, with their Personal Information, including PII, with the reasonable and mutual understanding that Defendant would safeguard their Personal Information.

140. Defendant received and accepted possession of Plaintiff's and Class members' Personal Information including PII for the purpose of collecting, storing, selling, and ultimately profiting from the Personal Information of Plaintiff and Class Members as part of Defendant's business practices.

141. When Plaintiff and Class members provided, and Defendant accepted, their Personal Information, Plaintiff and Class members entered into implied contracts with Defendant.

142. Through this exchange and these implied contracts, Defendant agreed to safeguard and protect their Personal Information, to keep such data secure and

1  confidential, and to timely and accurately notify Plaintiff and Class Members if their
2  data had been breached, compromised, or stolen.

3  143.   Plaintiff and Class Members reasonably believed and expected that
4  Defendant's data security practices complied with relevant laws and regulations
5  (including FTC guidelines on data security) and were consistent with industry
6  standards.

7  144.   In addition, Defendant's Privacy Policy included Defendant's promise to
8  protect nonpublic personal information given to Defendant or that Defendant gathered
9  on its own, from disclosure, as set forth in Defendant's Privacy Policy, which was
10 posted on its website.

11 145.   Plaintiff and Class members performed their obligations under the
12 contracts when they provided their Personal to Defendant, or Defendant collected and
13 maintained their PII, in relation to their accounts and services with Defendant.

14 146.   Plaintiff and Class Members would not have entrusted their Personal
15 Information to Defendant without the implied assurance that Defendant would keep
16 their Personal Information secure from unauthorized access, disclosure, or exfiltration.

17 147.   Defendant breached its contractual obligation to protect the PII Defendant
18 gathered when the information was exposed to unauthorized third parties in the Data
19 Breach.

20 148.   As a direct and proximate result of the Data Breach, Plaintiff and Class
21 members have been harmed and have suffered, and will continue to suffer, damages
22 and injuries, including, but not limited to: (i) invasion of privacy; (ii) theft of their
23 Personal Information including PII; (iii) lost or diminished value of their PII; (iv) lost time
24 and opportunity costs associated with attempting to mitigate the actual consequences
25 of the Data Breach) (v) statutory damages; (vii) nominal damages; and (viii) the
26 continued and certainly increased risk to their Personal Information, including PII,
27 which: (a) remains unencrypted and available for unauthorized third parties to access
28 and abuse; and (b) remains in Defendant's continued possession and is subject to

further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect their Personal Information.

149.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

150.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring and identity theft protection services to all Class Members.

## FOURTH CAUSE OF ACTION

### Negligence

151.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

152.    Defendant owed various duties to Plaintiff and the Class, including pursuant to the CCPA, as alleged in detail above.  Defendant owed duties to Plaintiff and the Class with regard to their manner of collection, transmission, sharing, and maintenance of Plaintiff's and the Class members' Personal Information, including PII, and were required to maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class members Personal Information.

153.    Defendant's duty to act reasonably in collecting, storing, and maintaining the Personal Information, and to use reasonable care in protecting such information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Personal Information that it either affirmatively acquires, maintains, or stores. Industry standards require Defendant to exercise reasonable care with respect to Plaintiff and Class members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class members. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data

CLASS ACTION COMPLAINT

Breach. In this case, Defendant was the only entity that could adequately protect the data that that it solicited, collected, and stored.

154. Defendant breached its respective duties by engaging in the conduct and omissions alleged above and in violation of the CCPA, UCL, FTC Act, as well as its Privacy Policy as alleged above.

155. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class members.

156. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

157. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

158. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class members.

159. Defendant is both the actual and legal cause of Plaintiff's and the Class members' damages.

160. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Personal Information is used; (iii) the compromise, publication, and/or theft of their Personal Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Personal Information; (v) lost opportunity costs associated with effort expended and the loss of productivity

CLASS ACTION COMPLAINT

addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Personal Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information of Plaintiff and Class members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

161.   Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer actual damages, invasion and loss of privacy, and emotional distress as described herein and above, and the continued risks of exposure of their Personal Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information in its continued possession.

162.   Due to the egregious violations alleged herein, Plaintiff asserts that Defendant breached its duties in an oppressive, malicious, despicable, gross, and wantonly negligent manner. Defendant's conscious disregard for Plaintiff's privacy right entitles Plaintiff and the Class to recover punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of themselves and all members of the Class respectfully requests that (i) this action be certified as a class action, (ii) Plaintiff be designated a representative of the Class, and (iii) Plaintiff's counsel be appointed as counsel for the Class. Plaintiff, on behalf of herself and members of the Class further requests that upon final trial or hearing, judgment be awarded against Defendant for:

CLASS ACTION COMPLAINT

1    (i)    actual and punitive damages to be determined by the trier of fact;

2    (ii)    equitable relief, including restitution;

3    (iii)    pre- and post-judgment interest at the highest legal rates applicable;

4    (iv)    appropriate injunctive relief;

5    (v)    attorneys' fees and litigation expenses under Code of Civil

6    Procedure § 1021.5 and other applicable law;

7    (vi)    costs of suit; and

8    (vii)    such other and further relief the Court deems just and proper.

9    **<ins>DEMAND FOR JURY TRIAL</ins>**

10    Plaintiff hereby demands a jury trial on all issues so triable.

11

12    Dated: March 27, 2025              Respectfully submitted,

13                                      **KAZEROUNI LAW GROUP, APC**

14

15    By:  _/s/ Abbas Kazerounian_

16    Abbas Kazerounian, Esq.
Mona Amini, Esq.
Gor Antonyan, Esq.

17    245 Fischer Avenue, Unit D1
Costa Mesa, California 92626

18    Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

19    *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT